FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT -4  PM 2: 42

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS WILLIAMS, JR.                    CIVIL ACTION

VERSUS                                  NUMBER: 05-0206

N. BURL CAIN, WARDEN                    SECTION: "F"(5)


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Thomas Williams, Jr., and the State's response thereto.  (Rec. docs. 2, 4, 5).  Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Williams' petition be dismissed with prejudice.

Petitioner Williams is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 26, 2000, Williams was found guilty of second degree murder after trial, by jury, in the Seventeenth Judicial

___ Fee_____
___ Process_____
_X/ Dktd_____
_✓_ CtRmDep_____
___ Doc. No._____

District Court for the Parish of Lafourche, State of Louisiana.  On December 7, 2000, Williams was sentenced to life imprisonment at hard labor.  Williams' conviction and sentence were affirmed by the Louisiana First Circuit Court of Appeal on December 28, 2001. State v. Williams, 804 So.2d 932 (La. App. 1st Cir. 2001).  Writs were denied by the Louisiana Supreme Court on February 14, 2003. State v. Williams, 836 So.2d 135 (La. 2003).  Williams was subsequently denied post-conviction relief at all three levels of the state court system. State ex rel. Williams v. State, 888 So.2d 857 (La. 2004); State ex rel. Williams v. State, No. 2003-KW-1852 (La. App. 1st Cir. Nov. 17, 2003)(unpublished order).  As will be discussed more fully infra, with the exception of his third claim for relief which is procedurally barred due to non-exhaustion, Williams has exhausted available state court remedies as to his three other claims as required by 28 U.S.C. §2254(b)(1)(A).  The State concedes that Williams' petition is timely under 28 U.S.C. §2244(d).  (Rec. doc. 5, p. 5).

In the instant petition, Williams presents four claims for relief which he frames as follows:

I.   [p]etitioner was denied due process and equal protection of the laws by being indicted by a grand jury that was selected in a racially discriminatory manner.

II.  [p]etitioner was denied the effective assistance of trial counsel for counsel's failure to file a motion to quash the grand jury indictment which had been returned by a grand jury that was selected in a racially discriminatory manner.

III. [p]etitioner was denied due process and equal protection of the laws when he was denied necessary documents to support his post-conviction relief claims.

IV. [e]vidence legally insufficient to support conviction for second-degree murder.

> (Petitioner's supporting memo at p. 3).

In order to facilitate a resolution of Williams' claims, the Court recalls the evidentiary facts that were established at his trial as aptly summarized by the Louisiana First Circuit as follows:

> [o]n the evening of March 3, 1999, defendant was spending the night with his estranged wife, Regina Williams, at their apartment in Thibodaux, Louisiana. According to defendant, they had been separated for several weeks, but were attempting to reconcile. Defendant also had invited two acquaintances, Joseph Landry and Reginal Cutno, to spend the night in the living room of the apartment. At some point, defendant left the apartment but later returned. Between approximately 3:00-3:30 a.m., Joseph and Reginal were awakened by Regina yelling "Oh, Mr. Joe, he stabbing me to death." Joseph went to the bedroom and saw the victim sitting in bed, with defendant standing behind her, drinking a beverage. Joseph told defendant, "Man, what is this? You bring me to your house. What is this, you know?" Joseph then walked out of the room, with the victim following him. As he headed to the front door, telling Reginal, "Man, let's get out of here. This man has gone crazy!", he heard the victim collapse and fall to the floor. He and Reginal then rushed out of the apartment.
>
> Outside the apartment, they immediately encountered Latasha Ward, the victim's

3

daughter, and her friend, Rosetta Brown. Latasha lived in a apartment next door, which shared a common wall with her mother's apartment. Latasha and Rosetta had been talking in Latasha's apartment, when they heard the victim screaming for help and for "Tony" (a nickname of defendant) to "stop". Latasha and Rosetta ran to the front door of the victim's apartment, and saw defendant stabbing himself with a black knife as Joseph and Reginal exited the apartment. Latasha beat on the locked door, but was unable to get into the apartment. She finally ran back to her apartment to get her husband, Eric Ward. Eric and Joseph then kicked in the door. At that point, Reginal saw defendant stabbing himself with a knife. Upon entering the apartment, the group found the victim lying on the floor in a pool of blood with defendant lying beside her, about to stab himself again. Eric took the knife away and placed it on the kitchen counter. Defendant told them the victim had stabbed him first.

The police arrived shortly thereafter and attempted to render aid to both the victim and defendant. However, the victim died at the scene from multiple stab wounds. She sustained a total of sixteen stab wounds, primarily in the upper neck and chest area. Five of the stab wounds were potentially lethal; three of those wounds penetrated her heart. The police recovered a black-handled steak knife from the kitchen counter, as well as a knife from the bed in the bedroom and a knife blade from the floor beside the bed.

Officer Anthony Reed of the Thibodaux City Police was one of the first officers on the scene. When defendant was taken to the hospital by ambulance, Reed followed in his patrol car and entered the emergency room with the defendant. Dr. Vance Broussard was the physician who treated defendant in the emergency room. When he asked defendant what happened, Reed was standing only a few feet away. Defendant replied that he was arguing with the victim when she stabbed him with a

4

knife, and that he then turned around and stabbed her with another knife.

At that point, Reed stepped in, advised defendant of his *Miranda* rights and asked him what had happened. Defendant said that he was lying in bed sleeping when the victim came in, fussing at him for going out earlier and about her hair. He said the victim picked up a knife that was lying on a dresser and stabbed him in the stomach. According to defendant, he then ran to the kitchen and got a knife, which he used to stab the victim. He stated, "We kept stabbing each other until that dude [Eric Ward] took the knife out of my hand." Shortly after making these statements, defendant was taken into the operating room for exploratory surgery. He had sustained multiple small lacerations on the front of his chest, stomach, and upper abdomen, as well as three wounds on the side of his neck.

A few days later, on March 6, 1999, Detective Brent Graham went to the hospital to obtain a statement from defendant. After being advised of his *Miranda* rights, defendant made a tape-recorded statement in which he admitted stabbing the victim, but claimed that she stabbed him first. In this statement, defendant claimed he used a second knife that was on the dresser to stab the victim. He denied inflicting any stab wounds upon himself. Defendant was not under arrest at the time he gave his statement, but subsequently was arrested and indicted for the murder of his wife, Regina.

<u>Williams</u>, 804 So.2d at 937-38.

Williams' first three claims for relief are somewhat related and will therefore be addressed together. In his first claim for relief, Williams alleges that the grand jury that indicted him was selected in a racially discriminatory fashion. Williams' second

claim is that his attorney was ineffective for failing to file a pre-trial motion to quash the allegedly defective indictment. In his third claim, Williams alleges a denial of due process and equal protection in that the trial court failed to order that he be provided with documentation to support his post-conviction relief application ("PCRA"). When presented with Williams' first claim in the PCRA context, the state trial court ruled as follows:

> Mr. Williams' first claim is that the grand jury which indicted him was unconstitutionally selected. He specifically claims that the grand jury foreman was selected in a discriminatory manner. Louisiana Code of Criminal Procedure Articles 535.C and 521 require that a motion to quash a grand jury indictment on the grounds that the manner of the selection of the grand jury was illegal must be filed within fifteen days of the arraignment. Mr. Williams was arraigned on August 19, 1999. Therefore, the defendant had until September 3, 1999, to file the motion to quash. The record reveals that a motion to quash was never filed by the defendant. Louisiana Code of Criminal Procedure Article 535.D. provides that:

>> The grounds for a motion to quash under Paragraphs B and C are waived unless a motion to quash is filed in conformity with those provisions.

> Because a motion to quash was not timely filed, the defendant waived his right to quash the indictment on the ground that the manner of selection of the grand jury was illegal. For this reason, Argument 1 is denied.

In Deloch v. Whitley, 684 So.2d 349 (La. 1996), the Louisiana Supreme Court held that a defendant's failure to file a pre-trial motion to quash waives his equal protection claim arising out of

the allegedly discriminatory selection of the grand jury foreperson. Following Deloch, the Fifth Circuit has held that "[i]t is undisputable that under Louisiana law, a challenge to the legality of the grand jury venire must be made by a pretrial motion to quash", absent which the claim is procedurally barred. Williams v. Cain, 125 F.3d 269, 273-74 (5th Cir. 1997), cert. denied, 525 US. 859, 119 S.Ct. 144 (1998). Here, Williams failed to file a pre-trial motion to quash. "Therefore, under Louisiana law his claim is procedurally barred." Id. at 275 (citing Deloch, 684 So.2d at 350).

Williams having failed to comply with the state's procedural rule as to when racial discrimination claims can be raised, he must show that he was prejudiced. Pickney v. Cain, 337 F.3d 542, 545-46 (5th Cir. 2003). This petitioner cannot do. Even if Williams had been successful in having his grand jury indictment quashed, the State would have undoubtedly sought and obtained a second indictment against him. Id. at 545; Brown v. Cain, 337 F.3d 546, 550 n.5 (5th Cir. 2003), cert. denied, 540 U.S. 1117, 124 S.Ct. 1065 (2004). And, the Court having concluded that Williams suffered no prejudice as a result of his counsel's failure to file a pre-trial motion to quash the grand jury indictment, his second, related claim of ineffective assistance of counsel also fails. Pickney, 337 F.3d at 546. See also Michel v. State of Louisiana, 350 U.S. 91, 100-01, 76 S.Ct. 158, 164 (1955)(mere fact that motion to quash

7

was not filed does not overcome presumption of counsel's effectiveness).

In his third claim for relief, Williams contends that he was denied due process and the equal protection of the laws based on the trial court's failure to order various custodians of records to provide petitioner with certain documents for use in his PCRA proceedings.

Contemporaneously with filing his PCRA, Williams also filed a "Motion and Order for Production of Documents" in the state trial court, asking that tribunal to order the Lafourche Parish Registrar of Voters, the Lafourche Parish Clerk of Court, and the Office of the State Registrar to provide him with documents that would possibly support his racial discrimination claim.  On July 22, 2003, the trial court denied Williams' PCRA and motion for production of documents, construing the latter request as having been brought under Louisiana Public Records Law, LSA-R.S. 44:1, et seq., and noting that Williams had made no showing of having first requested and been denied the records by the three custodians in the first instance, a condition precedent to obtaining court-ordered production under R.S. 44:35.  From that unfavorable ruling, Williams sought writs from the Louisiana First Circuit which were denied on November 17, 2003.  State ex rel. Williams v. State, No. 2003-KW-1852 (La. App. 1st Cir. Nov. 17, 2003)(unpublished order). Dissatisfied with that ruling, Williams then sought writs from the

Louisiana Supreme Court, framing the issues for review as follows:

1.  [a]re the rudimentary demands of justice served when an African-American citizen of the United States is indicted for a criminal offense by a state grand jury that has been selected in a racially discriminatory manner?

2.  [h]as trial counsel rendered effective assistance of counsel as guaranteed by both the Constitutions of the United States and the State of Louisiana when he has not asserted his client's Equal Protection and Due Process rights by timely challenging the indictment that was returned by a grand jury which was selected in a racially discriminatory manner?

(Sup. Ct. writ app. at p. 3).

Although Williams reiterated his request that the custodians of the records be ordered to provide him with the sought-after documents, nowhere in his writ application did he specifically allege that the trial court's denial of his motion for production of documents amounted to a violation of his due process and equal protection rights.

The exhaustion requirement embodied in 28 U.S.C. §2254(b)(1)(A) is satisfied only where the substance of a federal habeas claim has been fairly presented to the state's highest court. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845 (1998)(citing Picard v. Connor, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512-13 (1971). "'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar

9

state-law claim was made.'" <u>Wilder v. Cockrell</u>, 274 F.3d 255, 259 (5th Cir. 2001)(quoting <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S.Ct. 276, 277 (1982)).  "Indeed, 'where [a] petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement.'" <u>Wilder</u>, 274 F.3d at 259 (quoting <u>Vela v. Estelle</u>, 708 F.2d 954, 958 n.5 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 464 U.S. 1053, 104 S.Ct. 736 (1984)).

Related to the exhaustion requirement is the doctrine of procedural default, another separate but distinct limit on the availability and scope of federal habeas review.  <u>Nobles</u>, 127 F.3d at 420-23.  "A procedural default ... occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims would now find the claims procedurally barred.'" <u>Id</u>. at 420 (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557 n.1 (1991)); <u>Sones v. Hargett</u>, 61 F.3d 410, 416 (5th Cir. 1995).

With limited exceptions not relevant here, Article 930.8 of the Louisiana Code of Criminal Procedure provides that no application for post-conviction shall be considered by the state courts if it is filed more than two years after the judgment of conviction and sentence of a defendant have become final.  The Fifth Circuit has determined that Article 930.8 constitutes an independent and adequate state rule that is regularly applied by

the state courts.  Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997), cert. denied, 523 U.S. 1125, 118 s.Ct. 1811 (1998).

As noted above, Williams has never presented his due process/equal protection claim to the Louisiana Supreme Court for its consideration.  Any attempt by him to do so at this late juncture would be futile in light of Article 930.8.  Accordingly, federal habeas review of Williams' due process/equal protection claim is barred unless he can establish cause for his procedural default and actual prejudice as a result of the alleged constitutional violation, or if he can demonstrate that the failure to entertain the claim will result in a fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565 (1991).

Williams cannot make the requisite showing of cause sufficient to obtain habeas review of his due process/equal protection claim because no external impediment prevented him from presenting that claim to the Louisiana Supreme Court prior to the expiration of the time period set forth in Article 930.8.  See, e.g., Moore v. Roberts, 83 F.3d 699, 704 (5th Cir. 1996), cert. denied, 519 U.S. 1093, 117 s.Ct. 772 (1997).  Without a showing of cause, the Court need not consider the element of prejudice.  See Murray v. Carrier, 477 U.S. 478, 494-95, 106 S.Ct. 2639, 2649 (1986).  And because Williams makes no colorable showing of actual innocence, he has not demonstrated that a fundamental miscarriage of justice will occur

11

if his due process/equal protection claim is not considered. Glover, 128 F.3d at 904.[1]/

Williams' fourth and final claim for relief is that the evidence was insufficient to support his conviction. Petitioner separates his fourth claim into three sub-parts: that he was not able to distinguish right form wrong at the time of the offense, the he was acting in self defense, and that he was guilty, at most, of the lesser included offense of manslaughter:

The appropriate standard of review of a claim of insufficiency of evidence is "... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The Fifth Circuit has held that in making determinations on the sufficiency of the evidence, the Court should not substitute its view of the evidence for that of the fact

_____

[1]/ Even if the Court were free to review the merits of Williams' due process/equal protection claim, it is doubtful that it would afford him any relief. The actions of the trial court complained of by him all occurred in the post-conviction relief context, proceedings that states are not constitutionally required to provide at all. Murray v. Giarratano, 492 U.S. 1, 8, 109 S.Ct. 2765, 2769 (1989); Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S.Ct. 1990, 1994 (1987); McCoy v. Lynaugh, 874 F.2d 954, 966 (5th Cir. 1989); Millard v. Lynaugh, 810 F.2d 1403, 1410 (5th Cir.), cert. denied, 484 U.S. 838, 108 S.Ct. 122 (1987). Williams makes no allegation that he was denied the requested documents due to his membership in a protected group and insofar as he failed to avail himself of state law mechanisms to obtain the records even after being alerted of the existence of such mechanisms by the trial court, no due process violation is apparent.

finder, but should consider all of the evidence in the light most favorable to the prosecution. <u>Whitmore v. Maggio</u>, 742 F.2d 230, 231-32 (5th Cir. 1984). The assessment of whether the commission of a crime is adequately supported by the record necessarily entails reference to the substantive elements of the criminal offense as defined by state law. <u>Alexander v. McCotter</u>, 775 F.2d 595, 597-98 (5th Cir. 1985); <u>Turner v. McKaskle</u>, 775 F.2d 999, 1001 (5th Cir. 1983).

As noted by the Louisiana First Circuit in Williams' direct criminal appeal, second degree murder is defined, in pertinent part, as "... the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." LSA-R.S. 14:30.1(A)(1). <u>Williams</u>, 804 So.2d at 939. Specific intent, which may be inferred from the circumstances of the crime and the actions of the defendant, is defined as "... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1).

Under Louisiana law, a legal presumption exists that a defendant is sane at the time of an offense and is thus responsible for his actions. LSA-R.S. 15:432. To rebut this presumption and thus avoid criminal responsibility, a defendant bears the burden of proving the defense of insanity by a preponderance of the evidence. LSA-C.Cr.P. Art. 652. The mere existence of a mental disease or

13

defect is insufficient.   Rather, the defendant must show that he suffered from a mental disease or defect that prevented him from distinguishing right from wrong at the time of the charged offense. LSA-R.S. 14:14.   The question of the defendant's sanity is a factual matter to be determined by the trier of fact after considering all of the evidence.   State v. Silman, 663 So.2d 27, 32 (La. 1995).

In passing on this specification of insufficiency in the context of Williams' direct criminal appeal, the Louisiana First Circuit aptly summarized the evidence bearing on petitioner's sanity, as follows:

> [i]n the present case, defendant presented no medical experts at trial to prove that he was insane at the time of the offense. Instead, he relied primarily on his extensive history of mental illness and serious psychiatric problems, including several episodes of self-mutilation, to establish that he was unable to distinguish between right and wrong at the time of the offense. Defendant presented testimony that he sustained head trauma in a motor vehicle accident when he was approximately thirteen years old, and since that time has been hospitalized fifteen to twenty times for psychiatric treatment. A friend of defendant testified about an incident three years before the homicide when defendant jumped from a car traveling 30-35 m.p.h.; another friend testified that on another occasion approximately twenty-five years ago he had to physically restrain defendant to prevent him from jumping out of a moving vehicle. Defendant's sister and brother-in-law testified that fifteen to twenty years ago they witnessed defendant, who was angry because of an argument he had with some men in the neighborhood, chop his thumb

off with a machete. When defendant was in
high school, his sister saw him ram his head
into a large glass window after he had a fight
with another boy as they were getting off a
school bus.

In rebuttal, the state presented the testimony
of Dr. Rafael Salcedo, an expert in the field
of clinical and forensic psychology, who also
served on the sanity commission in this case.
In addition to meeting with defendant on two
occasions, Dr. Salcedo reviewed defendant's
extensive medical records and the statement he
gave to the police on March 6, 1999. At
trial, Dr. Salcedo acknowledged there was no
question that defendant had a lengthy history
of serious psychiatric problems, which
included numerous incidents of self-mutilation
and suicide attempts. Although the medical
records reflected varying diagnoses of
defendant's condition. Dr. Salcedo stated the
primary diagnosis was atypical psychosis,
(i.e., psychosis not otherwise specified),
combined with issues of substance abuse. He
further stated that defendant was neither
schizophrenic nor retarded.

Despite defendant's psychiatric history, Dr.
Salcedo was of the firm opinion that he was
able to distinguish between right and wrong at
the time he committed the offense in question.
Dr. Salcedo noted there was a distinction
between the presence of a mental disorder and
whether or not a person can distinguish
between right and wrong. He further explained
that individuals with psychiatric disorders
are not continuously psychotic, but that their
symptoms tend to wax and wane, as appears to
have been the pattern with defendant. In any
event, Dr. Salcedo stated a person could even
be "actively psychotic and still be able to
distinguish right from wrong."

In forming his opinion that defendant was able
to distinguish right form wrong at the
pertinent time, Dr. Salcedo noted particularly
that there was no evidence of psychotic
reasoning in the statement defendant gave to

15

the police just two days after the homicide.
In fact, he opined that the police statement,
in which defendant claimed he acted in self-
defense, was lucid and "not consistent with
someone who is psychotic, delusional, [or]
disordered in their thinking to the degree
that they would be unable to distinguish right
form wrong." Under questioning by defense
counsel, Dr. Salcdeo admitted it was possible
that someone could be unable to distinguish
right from wrong at the time of an offense,
and two days later be able to do so. However,
he indicated that would be "somewhat unusual",
and observed that defendant himself did not
claim in the statement that he did not know
what he was doing. Rather, defendant
explained his conduct on the basis of self-
defense.

The state also presented the testimony of Dr.
Vance Broussard, who attended defendant in the
emergency room, and Officer Anthony Reed, who
spoke to defendant in the emergency room
shortly after the homicide. Dr. Broussard and
Officer Reed each testified that defendant was
alert, coherent, and responsive to questions
asked of him at that time. Officer Reed
stated that, when advised of his rights,
defendant indicated he understood those rights
and was willing to talk.

Considering the totality of the evidence, we
find that any trier of fact rationally could
have concluded that defendant failed to prove
by a preponderance of the evidence that he was
incapable of distinguishing between right and
wrong at the time of the offense. Although
evidence was presented at trial of defendant's
history of psychiatric problems, no medical
expert testified that he was insane at the
time of the offense. In contrast, the state
presented the testimony of Dr. Salcedo opining
that defendant was able to distinguish right
from wrong at the pertinent time. Further,
Officer Reed testified that defendant was
coherent and responsive shortly after the
homicide. Finally, we note the fact that
defendant repeatedly stabbed himself at the

16

> time of the offense can be interpreted as an
> attempt to bolster his claim of self-defense,
> as opposed to being a manifestation of
> insanity.  Based on these facts, a rational
> trier of fact could have found defendant
> failed to rebut the presumption of sanity by a
> preponderance of the evidence.
>
> For the above reasons, when all the evidence
> is viewed in the light most favorable to the
> state, we find any rational trier of fact
> could have concluded beyond a reasonable doubt
> ... [that] defendant failed to rebut the
> presumption of sanity by a preponderance of
> the evidence.
>
> <u>Williams</u>, 804 So.2d at
> 942-44.

Having reviewed the trial transcript in its entirety, the Court readily agrees with the Louisiana First Circuit's assessment of the evidence bearing on Williams' sanity at the time of the offense.  Williams' proof on the issue was remote in time as compared with that presented by the State which was more focused on the time of the victim's death.  Whether Williams had previously been treated for psychiatric illness in the past does not answer the ultimate question of whether he was able to distinguish right from wrong at the time of the murder.  Although Williams suggests that the testimony of the lay witnesses be accorded more weight than that given by the State's medical experts, the Court is hardly in a position to second-guess the jury's credibility determinations and their implicit rejection of his insanity defense. <u>See</u>, e.g., <u>Marler v. Blackburn</u>, 777 F.2d 1007, 1011-12 (5th Cir. 1985); <u>Armstead v. Maggio</u>, 720 F.2d 894, 896-97 (5th Cir. 1983); <u>Dunn v.</u>

<u>Maggio</u>, 712 F.2d 998, 1001 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 465 U.S. 1031, 104 S.Ct. 1297 (1984). The state courts' resolution of this aspect of Williams' insufficiency claim was not an unreasonable one. 28 U.S.C. §2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000); <u>Montoya v. Johnson</u>, 226 F.3d 399, 403-04 (5th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 1067, 121 S.Ct. 2220 (2001).

The second component of Williams' insufficiency claim is that he acted in self-defense. Louisiana law provides that a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." LSA-R.S. 14:20(1). The State bears the burden of proving, beyond a reasonable doubt, that the defendant did not act in self-defense. <u>State v. Lynch</u>, 436 So.2d 567, 569 (La. 1983); <u>State v. Brumfield</u>, 639 So.2d 312, 315 (La. App. 4th Cir. 1994). In evaluating a claim of self-defense, the finder of fact must determine whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily and whether the killing was necessary to save him from that danger in light of the circumstances. <u>State v. McClain</u>, 685 So.2d 590, 594 (La. App. 4th Cir. 1996).

The Court once again defers to the Louisiana First Circuit's

accurate summary of the evidence pertaining to Williams' defense of

self-defense, as follows:

> [t]he guilty verdict in this case indicates
> the jury rejected defendant's claim that he
> stabbed the victim in self-defense.  Viewing
> the evidence in the light most favorable to
> the prosecution, we find that it supports the
> jury's conclusion.  Although defendant has
> asserted repeatedly from the time of the
> victim's death that he stabbed her only after
> she first stabbed him in the stomach, and that
> the wounds he sustained were not self-
> inflicted, his claim is inconsistent with
> evidence presented by the state.  First,
> Joseph Landry testified that after being
> awakened by the victim's shouts, he walked
> into the bedroom and found defendant standing
> behind the victim drinking a beverage.  Landry
> stated that defendant did not appear agitated.
> Based on this evidence, the jury could have
> concluded that such conduct on defendant's
> part was not consistent with someone who just
> had been attacked with a knife.  Additionally,
> while four people heard the victim either
> screaming that she was being stabbed or
> calling for help, no one heard defendant call
> out similarly.  Further, although defendant
> asserted he was stabbed while lying in the
> bed, the largest bloodstain  found on the
> comforter taken from the bed was consistent
> with the victim's blood but not with
> defendant's.
>
> Even more significantly, although defendant
> claimed in his police statements that he and
> the victim each had a knife that they used to
> stab each other, the forensic evidence does
> not support this claim.  In his statement to
> Officer Reed, defendant specifically stated
> that the knife on the kitchen counter was the
> one he used, while the victim used the knife
> in the bedroom.   However, DNA evidence
> presented by the state indicated that only the
> victim's blood was found on the knife handle
> and blade found in the bedroom, which would
> appear to refute defendant's claim that the

19

victim used that knife to stab him. Moreover,
although defendant's blood was found on the
blade of the black-handled knife, eyewitness
testimony established that knife was taken
from defendant's hand after several people saw
him stabbing himself.   At trial, Reginal
Cutno, Latasha Ward, and Rosetta Brown each
testified they saw defendant stabbing himself
with a knife shortly after the victim's
collapse.   Further, Dr. Broussard, the
physician who examined defendant in the
emergency room, opined that his wounds were
self-inflicted, since there were no defensive
wounds on his arms and the wounds were all
quite shallow and very uniform, about the
width of a small knife.   Dr. Broussard
indicated that you would expect to see wounds
on someone injured in a struggle that were
more random in both location and depth, as
opposed to the very uniform pattern of wounds
sustained by defendant.

Under these circumstances, the jury reasonably
could have rejected defendant's claim that he
stabbed the victim in self-defense after she
attacked him with a knife.   Despite the fact
that defendant sustained multiple stab wounds,
the state presented overwhelming evidence from
which the jury could have concluded those
wounds were self-inflicted.   They jury
obviously rejected the version of events
claimed by defendant in his police statements.
When all of the evidence is viewed in the
light most favorable to the state, we find any
rational trier of fact could have concluded
beyond a reasonable doubt, and to the
exclusion of every reasonable hypothesis of
innocence, that the state established each
essential element of second degree murder and
that defendant did not kill the victim in
self-defense.

<u>Williams</u>, 804 So.2d
at 939-40.

Here again, Williams invites the Court to second-grues the

jury's obvious credibility determinations as to the medical cause

20

of his injuries and the veracity of the statements he made after the incident to the effect that the victim had stabbed him.  This the court cannot do.  <u>Marler</u>, 777 F.2d at 1011-12.  Measured against the <u>Jackson</u> standard, a rational juror could have concluded beyond a reasonable doubt that the State proved that Williams did not act in self-defense.

Petitioner's final specification of insufficiency is that the evidence established only that he was guilty of the lesser included offense of manslaughter.  The Louisiana First Circuit rejected this very argument in Williams' direct criminal appeal, opining as follows:

> [a]lternatively, defendant argues the evidence supports only a verdict of manslaughter because the stabbing occurred during an argument between him and the victim. He asserted in his taped police statement that the victim was frustrated and was fussing at him for going out to a bar that night when he had company staying at the apartment. Thus, he maintains the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. In support of this contention, he relies on the testimony of Reginal Cutno that he heard the victim and defendant arguing about the victim's jacket and about money sometime prior to hearing the victim yelling that she had been stabbed.
>
> La.R.S. 14:31A(1) defines manslaughter, in pertinent part, as follows:
>
>> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the

> offense is committed in sudden
> passion or heat of blood immediately
> caused by provocation sufficient to
> deprive an average person of his
> self-control and cool reflection.
> Provocation shall not reduce a
> homicide to manslaughter if the jury
> finds that the offender's blood had
> actually cooled, or that an average
> person's blood would have cooled, at
> the time the offense was
> committed...

"Sudden passion" and "heat of blood" are not
elements of the offense but, rather, are
factors in the nature of mitigating
circumstances that may reduce the grade of
homicide. Moreover, provocation is a question
of fact to be determined by the trier of fact.
The state does not bear the burden of proving
the absence of these mitigating factors beyond
a reasonable doubt. Consequently, the issue
is whether or not any rational trier of fact,
viewing the evidence in the light most
favorable to the prosecution, could have found
that the mitigating factors were not
established by a preponderance of the
evidence. See State v. Johnson, 98-1407, pp.
5-6 (La. App. 1st Cir. 4/1/99), 734 So.2d 800,
804, writ denied, 99-1386 (La. 10/1/99), 748
So.2d 439.

In the instant case, the jury reasonably could
have found that provocation sufficient to
deprive an average person of his self-control
and cool reflection was not established by a
preponderance of the evidence. Even if the
jury accepted defendant's claim that he and
the victim were engaged in an argument at the
time of the stabbing, the jury could have
concluded the argument was insufficient
provocation to deprive an average person of
his self-control and cool reflection.
According to defendant's statement, he was
arguing with the victim about going out to a
bar while he had company at the apartment.
There also was testimony from Reginal Cutno
that he heard defendant and the victim arguing
about a jacket and about money. However,

22

Reginal further stated that everything then became quiet and he went back to sleep. Regardless, the jury may have concluded that an argument about any of these subjects would not have deprived an average person of his self-control and cool reflection. Given the circumstances, it was not shown by a preponderance of the evidence that the verbal argument constituted sufficient provocation so as to warrant only a verdict of manslaughter herein.

As noted above, provocation is a question of fact to be determined by the trier of fact. See Johnson, 98-1407 at p. 5, 734 So.2d at 804. The jury obviously did not find provocation existed in the instant case. After a careful review of the entire record, we conclude a rational trier of fact, viewing all of the evidence, both direct and circumstantial, in the light most favorable to the prosecution, could have determined beyond a reasonable doubt that defendant was guilty of second degree murder to the exclusion of any reasonable hypothesis of innocence, and that no mitigating factors were established by a preponderance of the evidence.

Williams, 804 So.2d at 940-41.

At trial, Joseph Landry testified that after hearing the victim shout that she had been stabbed, he entered the bedroom and observed Williams standing behind the victim drinking some type of beverage. Landry further testified that Williams appeared calm and was not agitated until after the victim had collapsed on the floor. (Tr. pp. 26-46). Such evidence, the Court believes, could reasonably be viewed by the jury as establishing that the victim's murder was not committed in sudden passion or heat of blood. The state courts that were called upon to do so determined that the

23

evidence presented at Williams' trial was sufficient to sustain a conviction for second degree murder. Those determinations are entitled to great weight here, <u>Poretto v. Stalder</u>, 834 F.2d 461, 467 (5th Cir. 1987), particularly in light of the deference afforded under §2254(d).

## RECOMMENDATION

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Thomas Williams, Jr. be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

Baton Rouge, Louisiana, this ___4th___ day of ___October___, 2005.

_Alma L Chasez_
UNITED STATES MAGISTRATE JUDGE